**19-2593-MJ-GOODMAN**

Approved: _____
MATTHEW LAROCHE / JASON A. RICHMAN
Assistant United States Attorneys

Before: THE HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York

**19MAG 3705**

------------------------------------X
UNITED STATES OF AMERICA         :   **SEALED COMPLAINT**
                                 :
              -v.-               :   Violations of
                                 :   18 U.S.C. § 924(o); 21
                                 :   U.S.C. § 963
MARIO AMILCAR ESTRADA ORELLANA, and :
JUAN PABLO GONZALEZ MAYORGA,     :
                                 :   COUNTY OF OFFENSE:
              Defendants.        :   NEW YORK
                                 :
                                 :
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss.:

FRANCIS J. CUCCI, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

COUNT ONE
(Narcotics Importation Conspiracy)

1. From at least in or about December 2018, up to and including in or about April 2019, in the Southern District of New York, Guatemala, and elsewhere, MARIO AMILCAR ESTRADA ORELLANA and JUAN PABLO GONZALEZ MAYORGA, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that MARIO AMILCAR ESTRADA ORELLANA and JUAN PABLO GONZALEZ MAYORGA, the defendants, and others known and unknown, would and did knowingly and intentionally import into the United States and into the customs territory of the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

3. It was further a part and an object of the conspiracy that MARIO AMILCAR ESTRADA ORELLANA and JUAN PABLO GONZALEZ MAYORGA, the defendants, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

4. The controlled substance that MARIO AMILCAR ESTRADA ORELLANA and JUAN PABLO GONZALEZ MAYORGA, the defendants, and others known and unknown, conspired to (i) import into the United States and into the customs territory of the United States from a place outside thereof, and (ii) manufacture and distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States from a place outside thereof, was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963.)

COUNT TWO
(Conspiracy to Possess, Carry, and Use Machine Guns During and in Relation to a Drug Trafficking Crime)

5. From at least in or about December 2018, up to and including in or about April 2019, in the Southern District of New York, Guatemala, and elsewhere, MARIO AMILCAR ESTRADA ORELLANA and JUAN PABLO GONZALEZ MAYORGA, the defendants, and others known and unknown, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

6. It was a part and an object of the conspiracy that MARIO AMILCAR ESTRADA ORELLANA and JUAN PABLO GONZALEZ MAYORGA, the defendants, and others known and unknown, would and did, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the narcotics importation conspiracy charged in Count One of this Complaint, knowingly use and carry firearms, and, in furtherance of such drug trafficking crime, knowingly possess

firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Section 924(o).)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

7. I am a Special Agent with the DEA, and I have been involved in the investigation of the above-described offense. The information contained in this Complaint is based upon my personal knowledge and participation in this investigation, as well as on my conversations with other law enforcement agents and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Overview of the ESTRADA Conspiracy

8. Since in or about December 2018, the DEA has been investigating several individuals (the "Estrada Conspiracy") who attempted to solicit funding from international drug cartels to support the Guatemalan Presidential campaign (the "Estrada Campaign") of MARIO AMILCAR ESTRADA ORELLANA, the defendant. During certain of these negotiations, members of the Estrada Conspiracy interacted with purported members and associates of the Sinaloa Cartel — a powerful international drug-trafficking organization based in Mexico — who were, in fact, confidential sources (the "CSes") acting at the direction of the DEA. During the course of meetings and other communications between the CSes, ESTRADA, JUAN PABLO GONZALEZ MAYORGA, the defendant, and other members of the Estrada Conspiracy, the following took place, in part and among other things:

a. ESTRADA and GONZALEZ requested millions of dollars in drug proceeds from the Sinaloa Cartel to support the Estrada Campaign. In exchange for financial support from the Sinaloa Cartel, ESTRADA and GONZALEZ agreed that if ESTRADA was

3

elected president of Guatemala, ESTRADA would provide Guatemalan state-sponsored support to the Sinaloa Cartel's drug-trafficking activities. Among other things, ESTRADA and GONZALEZ agreed to provide the Sinaloa Cartel with unfettered access to Guatemalan airports and maritime shipping locations so that the cartel could transport ton quantities of cocaine through Guatemala and ultimately into the United States. ESTRADA also offered to appoint members of the Sinaloa Cartel to high-ranking Government positions in Guatemala so that the CSes would be positioned to advance the Sinaloa Cartel's drug-trafficking activities.

        b.    ESTRADA and GONZALEZ directed the CSes to hire hitmen to assassinate political rivals to ensure that ESTRADA was elected president of Guatemala. In particular, ESTRADA and GONZALEZ identified specific targets by name and agreed to provide the hitmen with firearms, including AK-47s, to carry out the murders.[1]

### Origins of the ESTRADA Conspiracy

        9.    Based on my involvement in this investigation, my conversations with others, including law enforcement officers, and my review of open source reporting, I know, among other things, that MARIO AMILCAR ESTRADA ORELLANA, the defendant, is currently a candidate to become president of Guatemala, the election of which is to be held in or about June 2019, and that ESTRADA represents a particular political party in Guatemala ("Party-1").

        10.   Based on my involvement in this investigation, including my conversations with a confidential source ("CS-1")[2], my review of recordings and draft transcripts of meetings in which CS-1 has participated, and my review of draft translations of messages sent and received by CS-1, I have learned the following, in substance and in part:

---

[1] The DEA promptly notified local authorities about these threats.

[2] CS-1 has been a paid law enforcement source since approximately 2016. All actions by CS-1 described herein were taken at the direction of law enforcement officials unless otherwise noted. Information provided by CS-1 has been deemed reliable and has sometimes been corroborated by independent evidence, including recordings, surveillance, and other source information.

a. On or about January 6, 2019, CS-1 met with JUAN PABLO GONZALEZ MAYORGA, the defendant, at GONZALEZ's office in the vicinity of Guatemala City, Guatemala (the "January 6 Meeting"). During the January 6 Meeting, the following occurred, in substance and in part:

i. GONZALEZ explained to CS-1 that GONZALEZ was an active member of Party-1 in Guatemala, and that Party-1's presidential candidate was MARIO AMILCAR ESTRADA ORELLANA, the defendant.

ii. GONZALEZ told CS-1 that the Estrada Campaign needed funding from a drug cartel to be competitive in the upcoming presidential election, and he asked if CS-1 knew of any drug cartels that would be interested in providing such funding. GONZALEZ also stated that ESTRADA, if elected president of Guatemala, would use various government agencies to support the cartel's drug-trafficking activities in Guatemala. For example, GONZALEZ told CS-1 that, if a drug cartel provided funding to the Estrada Campaign and ESTRADA won, the Cartel would have direct influence on the appointed secretaries of the Interior, which oversees the police, and Defense, which oversees the military.

b. The next day, on or about January 10, 2019, CS-1 met with GONZALEZ and ESTRADA in the vicinity of Guatemala City, Guatemala (the "January 10 Meeting").[3] During the January 10 Meeting, the following occurred, in substance and in part:

i. CS-1, GONZALEZ, and ESTRADA discussed whether CS-1 had access to a drug cartel that could provide funding to the Estrada Campaign. They further discussed that the money would potentially come from the sale of narcotics.

ii. CS-1 told ESTRADA that CS-1's contacts in the Sinaloa Cartel could provide funding, but that the cartel had concerns about whether ESTRADA, if elected president, could provide the cartel with access to the Government of Guatemala. ESTRADA responded that, if elected, ESTRADA would appoint members of the Sinaloa Cartel to the Ministry of the Interior, the Ministry of Defense, and to positions controlling Guatemala's seaports and airports. ESTRADA also asked that CS-1 provide the names of three potential candidates for each position so ESTRADA could choose between them.

---

[3] The January 6 Meeting and the January 10 Meeting were both unrecorded.

5

<u>The Defendants Meet Purported Sinaloa Cartel Representative CS-2</u>

11. On or about February 7, 2019, JUAN PABLO GONZALEZ MAYORGA, the defendant, met with CS-1 and a second confidential source involved in this investigation ("CS-2")[4] in the vicinity of Guatemala City, Guatemala (the "February 7 Meeting").[5] The February 7 Meeting was audio and video recorded. Based on my conversations with CS-1 and CS-2, my review of the recording of the February 7 Meeting, and my review of a draft transcript of the February 7 Meeting, I have learned the following, in substance and in part:

a. GONZALEZ explained that he and his family had a long history in Guatemalan politics. GONZALEZ detailed the current landscape of the presidential election and why GONZALEZ believed that MARIO AMILCAR ESTRADA ORELLANA, the defendant, had a good chance to win if the Sinaloa Cartel funded the campaign.

b. GONZALEZ also asked whether CS-1 and CS-2 could assassinate certain other political rivals who were threats to win the election. GONZALEZ stated that it "wouldn't be difficult" to kill a particular candidate because the candidate was "hated" but cautioned that another candidate was "well protected." GONZALEZ also stated that the Estrada Campaign "would pay you to do it" if the CSes carried out the requested murders.

c. GONZALEZ, CS-1, and CS-2 then discussed meeting with ESTRADA the following day. GONZALEZ told CS-1 and CS-2 to tell ESTRADA "[t]his is what I want, I want the Interior, I want defense, I want the airports . . . and the Ports," referring to the various branches of the government of Guatemala that the Sinaloa Cartel would seek to control if ESTRADA was elected president.

---

[4] CS-2 has been a paid law enforcement source since approximately 2008. All actions by CS-2 described herein were taken at the direction of law enforcement officials unless otherwise noted. Information provided by CS-2 has been deemed reliable and has sometimes been corroborated by independent evidence, including recordings and other source information.

[5] The February 7 Meeting, and the below-described meetings, took place predominantly in Spanish. The quotations and summaries contained herein are draft translations prepared by a DEA linguist and are subject to revision upon further review.

12. The following day, on or about February 8, 2019, MARIO AMILCAR ESTRADA ORELLANA and JUAN PABLO GONZALEZ MAYORGA, the defendants, met with CS-1 and CS-2 in the vicinity of Guatemala City, Guatemala (the "February 8 Meeting"). This meeting was audio and video recorded. Based on my review of the recordings of the February 8 Meeting, my review of draft transcripts of the February 8 Meeting, and my conversations with CS-1 and CS-2, I have learned that during the course of the February 8 Meeting, the following occurred, in substance and in part:

   a. CS-2 told the defendants that CS-2 represented Ismael Mayo Zambada, the leader of the Sinaloa Cartel, and that Zambada was interested in contributing to ESTRADA's campaign in exchange for ESTRADA supporting the cartel's drug-trafficking activities in Guatemala.

   b. ESTRADA told CS-1 and CS-2 that he could win the election if the cartel provided the Estrada Campaign with approximately 10 to 12 million U.S. dollars. ESTRADA explained that he needed to deliver a sizeable amount of money to each of the 22 districts in Guatemala so that he could obtain the necessary votes in each district and that he was planning to hire an individual for approximately $2 million dollars to help build the Estrada Campaign's online presence.

   c. The group then discussed how the Sinaloa Cartel would deliver the money to ESTRADA. CS-2 stated that the Sinaloa Cartel would send approximately $30 million worth of high-quality cocaine to New York, and that approximately $15 million of the proceeds of that cocaine would be transported to ESTRADA in Guatemala.

   d. CS-2 also stated that, in exchange for the drug money, CS-2 wanted ESTRADA to help the Sinaloa Cartel transport cocaine through airports in Guatemala. CS-2 estimated that the Sinaloa Cartel would send approximately 6 cocaine-laden airplanes per month through Guatemala, each of which would carry multiple tons of cocaine, and that CS-2 would pay ESTRADA the value of approximately 10 percent of the cocaine on each plane. In sum, CS-2 estimated that ESTRADA would receive payment for the value of approximately 40 to 50 tons of cocaine. During the course of the February 8 Meeting, the participants discussed that the cocaine was destined for the United States.

e. ESTRADA agreed to assist the Sinaloa Cartel's activities in exchange for campaign financing as proposed by CS-2.

f. GONZALEZ and ESTRADA also again discussed assassinating political rivals, and ESTRADA provided CS-2 with the names of two individuals who were potential targets. ESTRADA also identified one individual to target first, and he noted that this assassination would be easy to complete because the target had many enemies in Guatemala.

g. Finally, CS-2 explained that by the following week CS-2's clients in New York should start paying CS-2 for cocaine. As a result, CS-2 told ESTRADA that CS-2 expected to have the first $5 million ready for the Estrada Campaign in the near future.

February 2019 Meetings in Florida and Guatemala

13. On or about February 14, 2019, JUAN PABLO GONZALEZ MAYORGA, the defendant, met with CS-2 and an undercover officer ("UC-1") in an undercover DEA warehouse (the "Warehouse") in Florida (the "February 14 Meeting"). This meeting was audio and video recorded. Based on my review of the recordings of the February 14 Meeting, my review of draft transcripts of the February 14 Meeting, and my conversations with CS-2 and UC-1, I have learned that during the course of the February 14 Meeting, the following occurred, in substance and in part:

a. CS-2 introduced UC-1 to GONZALEZ as a hitman who was available for hire to carry out the assassinations proposed by GONZALEZ and MARIO AMILCAR ESTRADA ORELLANA, the defendant.

b. GONZALEZ then discussed with CS-2 and UC-1 the Estrada Campaign's desire to assassinate certain political rivals. GONZALEZ identified for CS-2 the person he thought was easiest "to take out," and stated that he wanted it done "as fast as possible." GONZALEZ also promised to provide CS-2 and UC-1 with additional information on their initial targets, and GONZALEZ told them that "we want to see the public reaction after the first two hits" before going forward with the others. GONZALEZ also told them that he could provide "lots of AK-47s" to carry out the job, and when UC-1 specified that he needed "3

8

AK-47s and 2 pistols," GONZALEZ replied that "Mario [ESTRADA] will have everything ready for you."

        c. CS-2 and UC-1 showed GONZALEZ a vehicle located in the Warehouse (the "Vehicle") that contained packages of fake U.S. currency secreted in a hidden compartment inside the trunk. CS-2 and UC-1 then advised GONZALEZ that the Vehicle contained approximately $5 million for the Estrada Campaign.

        d. GONZALEZ then placed a video call to ESTRADA. During that call, GONZALEZ handed the phone to CS-2, and CS-2 used GONZALEZ's phone to show ESTRADA the Warehouse and purported bulk currency in various locations in the Warehouse.

        14. On or about February 14, 2019, MARIO AMILCAR ESTRADA ORELLANA, the defendant, met with CS-1 in the vicinity of Guatemala City, Guatemala (the "Second February 14 Meeting"). This meeting was audio recorded. Based on my review of the recordings of the Second February 14 Meeting, my review of draft transcripts of the Second February 14 Meeting, and my conversations with CS-1, I have learned that during the course of the Second February 14 Meeting, ESTRADA stated, in substance and in part, that GONZALEZ was careless for calling him from the Warehouse, and ESTRADA was concerned about potential criminal charges as a result of their activities.

        15. On or about February 18, 2019, MARIO AMILCAR ESTRADA ORELLANA, the defendant, met with CS-1 in the vicinity of Guatemala City, Guatemala (the "February 18 Meeting"). This meeting was audio recorded. Based on my review of the recording of the February 18 Meeting, my review of draft transcripts of the February 18 Meeting, and my conversations with CS-1, I have learned that during the course of the February 18 Meeting, the following occurred, in substance and in part:

        a. ESTRADA stated that he had associates ready to receive money from the Sinaloa Cartel. CS-1 responded that the Sinaloa Cartel had originally planned to provide the money to the Estrada Campaign from a large drug sale in New York, but when JUAN PABLO GONZALEZ MAYORGA, the defendant, traveled to Miami, they instead decided to use drug money from sales in Miami.

        b. ESTRADA and CS-1 then discussed the Sinaloa Cartel's drug-trafficking activities and the potential for the Cartel to benefit from the developing relationship with the Estrada Campaign. CS-1 said that the Sinaloa Cartel was selling

weapons to customers that included a Lebanese arms dealer, and ESTRADA responded that weapons trafficking was a huge business.

16. On or about February 27, 2019, MARIO AMILCAR ESTRADA ORELLANA, the defendant, met with CS-1 and CS-2 on an undercover DEA yacht (the "UC Yacht") in the vicinity of Miami, Florida (the "February 27 Meeting"). This meeting was audio and video recorded. Based on my review of the recording of the February 27 Meeting, my review of draft transcripts of the February 27 Meeting, and my conversations with CS-1, I have learned that during the course of the February 27 Meeting, the following occurred, in substance and in part:

   a. ESTRADA began the meeting by stating that he expected to win the election, and wanted to be clear with CS-1 and CS-2 about their partnership and plans.

   b. CS-2 told ESTRADA that the Sinaloa Cartel recently received 30 tons of cocaine in New York, and that the cartel would pay ESTRADA from the proceeds of that cocaine. CS-2 also stated that the Sinaloa Cartel already had $5 million in Miami for ESTRADA. ESTRADA replied, among other things, that he has a contact ("CC-1") who was able to help move money to Guatemala.

   c. CS-2 and ESTRADA also discussed their agreement concerning how ESTRADA would support the Sinaloa Cartel's drug trafficking if ESTRADA were elected president. CS-2 stated that the cartel wanted to send up to approximately six cocaine-laden planes per month to Guatemala, and that ESTRADA would receive 10 percent of the profits from sale of the cocaine transported. CS-2 also stated that the drugs would be transported from Guatemala, through Mexico, and then into New York.

   d. ESTRADA stated that he was "convince[d] that I'm going to win [the election]" and that after he won, ESTRADA would support the cartel's drug-trafficking activities in Guatemala. In particular, ESTRADA agreed to accept the Sinaloa Cartel's cocaine-laden planes at airports and ports in Guatemala. ESTRADA also agreed to appoint cartel members to key government positions.

   e. ESTRADA asked CS-2 to bring him 1 or 2 million dollars because ESTRADA needed to quickly invest it in the campaign. CS-2 provided ESTRADA with $10,000 in cash, and noted that CS-2 did not want to give ESTRADA more money at that time

10

because a large sum of money could draw law enforcement scrutiny on ESTRADA's trip home.

f. ESTRADA also told CS-2 that he no longer wanted CS-2 and UC-1 to move forward with the proposed assassinations. ESTRADA explained that someone else was going to assassinate one of the potential targets, and ESTRADA thought it would bring too many problems if they proceeded with the other assassinations.

March 2019 Meetings in Florida and Guatemala

17. On or about March 4, 2019, MARIO AMILCAR ESTRADA ORELLANA, the defendant, met with CC-1 and CS-1 at ESTRADA's office in the vicinity of Guatemala City, Guatemala (the "March 4 Meeting"). This meeting was audio recorded. Based on my review of the recordings of the March 4 Meeting, my review of draft transcripts of the March 4 Meeting, and my conversations with CS-1, I have learned that during the course of the March 4 Meeting, the following occurred, in substance and in part:

a. ESTRADA emphasized that the Estrada Campaign urgently needed funds from the Sinaloa Cartel to pay its expenses. ESTRADA, CC-1, and CS-1 discussed how they could deliver the Cartel's money to the Estrada Campaign in Guatemala. ESTRADA suggested that they use the UC Yacht to transport ESTRADA's money. ESTRADA then took out a map, and demonstrated how the UC Yacht could travel from Miami, through Cuba, before arriving in Guatemala.

b. CC-1 questioned whether the UC Yacht would be detected by law enforcement, and ESTRADA responded that those risks were mitigated by the fact that the UC Yacht was a luxury yacht, flying the American flag, and sailed by American citizens. ESTRADA further explained that it might be easier to buy a yacht than to pay the transportation fees they had been discussing.

18. On or about March 5, 2019, MARIO AMILCAR ESTRADA ORELLANA, the defendant, met with CC-1 and CS-1 at ESTRADA's office in the vicinity of Guatemala City, Guatemala (the "March 5 Meeting"). This meeting was audio recorded. Based on my review of the recordings of the March 5 Meeting, my review of draft transcripts of the March 5 Meeting, and my conversations with CS-1, I have learned that during the course of the March 5 Meeting, the following occurred, in substance and in part:

11

   a. CS-1 told ESTRADA that he had a source who could move $500,000 per week at a rate of 12 percent commission. ESTRADA responded that CC-1 had also found someone who was able to help move money from Miami. ESTRADA then instructed CC-1 to finalize negotiations with CC-1's source for the first $2 million that they were seeking to transport.

   b. CC-1 explained that CC-1's supplier was someone whom CC-1 had known for a long time, and CC-1 had contacts in Guatemala City who could exchange the United States dollars to local currency.

   19. On or about March 25, 2019, MARIO AMILCAR ESTRADA ORELLANA, the defendant, met with CS-1 at ESTRADA's office in the vicinity of Guatemala City, Guatemala (the "March 25 Meeting"). This meeting was audio recorded. Based on my review of the recordings of the March 25 Meeting, my review of draft transcripts of the March 25 Meeting, and my conversations with CS-1, I have learned that during the course of the March 25 Meeting, the following occurred, in substance and in part:

   a. ESTRADA stated that he was arranging for another crew to get involved to bring the balance of the money from the Sinaloa Cartel to Guatemala because ESTRADA had run out of money himself and his campaign was stalling.

   b. ESTRADA also stated that he was separately working with a drug trafficker based in Guatemala, who was also supporting ESTRADA's bid for president. ESTRADA also told CS-1 that he heard that people from the JNG Cartel wanted to provide ESTRADA with funding as well.[6]

   20. On or about April 11, 2019, CS-2 contacted MARIO AMILCAR ESTRADA ORELLANA, the defendant, by phone while CS-2 was in Manhattan, New York (the "April 11 Call"). The April 11 Call was audio recorded. Based on my review of a draft transcript of the April 11 Call and my conversations with CS-2, I have learned that during the course of the April 11 Call, the following occurred, in substance and in part:

---

[6] Based on my training and experience, I have learned that the "JNG Cartel" is a reference to the Jalisco Nueva Generación Cartel, a drug-trafficking organization based in Jalisco, Mexico.

      a. CS-2 informed ESTRADA that CS-2 was in Manhattan making a drug delivery and that once the drugs were paid for, CS-2 would have the money to deliver to ESTRADA.

      b. CS-2 further told ESTRADA that CS-2 had been authorized to have a new distribution route from Guatemala, through Mexico, to New York, and the new route would start once ESTRADA won the election. ESTRADA responded by saying that they were "crossing the river without having built the bridge," and that he needed the money CS-2 had promised before he would support the cartel's drug-trafficking activities.

    21. On or about April 11, 2019, CS-2, contacted JUAN PABLO GONZALEZ MAYORGA, the defendant, by phone while CS-2 was in Manhattan, New York (the "Second April 11 Call"). The Second April 11 Call was audio recorded. Based on my review of a draft transcript of the Second April 11 Call and my conversations with CS-2, I have learned that during the course of the Second April 11 Call, the following occurred, in substance and in part:

      a. CS-2 informed GONZALEZ that CS-2 now had money available for the Estrada Campaign, and CS-2 asked if GONZALEZ could travel to Miami to pick up the money. GONZALEZ responded that he could travel to Miami, and CS-2 and GONZALEZ discussed when GONZALEZ could travel.

      b. GONZALEZ and CS-2 also discussed how if ESTRADA was elected president the CSes would be placed in key positions within the government. GONZALEZ stated that he would discuss specific positions with CS-2 once CS-2 delivered the money to GONZALEZ for the Estrada Campaign.

WHEREFORE, deponent prays that warrants issue for MARIO AMILCAR ESTRADA ORELLANA and JUAN PABLO GONZALEZ MAYORGA, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

_____
FRANCIS J. CUCCI
Special Agent
Drug Enforcement Administration

Sworn to before me this
16th day of April 2019

_____
THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

Mod AO 442 (09/13) Arrest Warrant    AUSA Name & Telno:  JASON RICHMAN 212 637-2589; MATTHEW LAROCHE 212 637-2420

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

1 9 MAG 3705

| United States of America | ) |
|---|---|
| v. | ) |
| MARIO AMILCAR ESTRADA ORELLANA | ) Case No. 19 Cr. |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| Defendant | |

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*    MARIO AMILCAR ESTRADA ORELLANA ,

who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment    ☐ Superseding Indictment    ☐ Information    ☐ Superseding Information    ☑ Complaint
☐ Probation Violation Petition    ☐ Supervised Release Violation Petition    ☐ Violation Notice    ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to import cocaine; and conspiracy to posess, carry and use machine guns during and in relation to the drug trafficking crime (21 U.S.C. § 963; 18 U.S.C. § 924(o))

Date:  4-16-19

_____
*Issuing officer's signature*

City and state:    New York, New York            United States Magistrate Judge Barbara Moses
                                                  *Printed name and title*

---

**Return**

This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____
at *(city and state)* _____ .

Date: _____            _____
                               *Arresting officer's signature*

                               _____
                               *Printed name and title*

Mod AO 442 (09/13) Arrest Warrant    AUSA Name & Telno: JASON RICHMAN 212 637-2589; MATTHEW LAROCHE 212 637-2420

## UNITED STATES DISTRICT COURT
for the
Southern District of New York

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 19MAG3705 |
| JUAN PABLO GONZALEZ MAYORGA | ) | 19 Cr. |
| | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

### ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*  JUAN PABLO GONZALEZ MAYORGA ,

who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☑ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to import cocaine; and conspiracy to posess, carry and use machine guns during and in relation to the drug trafficking crime (21 U.S.C. § 963; 18 U.S.C. § 924(o))

Date: 4-16-19

_____
*Issuing officer's signature*

City and state: New York, New York

United States Magistrate Judge Barbara Moses
*Printed name and title*

---

**Return**

This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____
at *(city and state)* _____.

Date: _____

_____
*Arresting officer's signature*

_____
*Printed name and title*